[No. 1928.]

GEORGE H. MOORE *v.* THE STATE.

1. ALLEGATA AND PROBATA — VARIANCE.— INDICTMENT for obtaining money or property by means of false pretenses, etc., should fully set out and describe the matter alleged to be false, and the matter thus alleged, being material and descriptive, should be proved as alleged.  The indictment, however, may set out the matter either by substance or by tenor.  If it sets out representations by their tenor, then the proof must conform strictly to the allegations; if by substance, then it is only necessary to prove the substance of the words or the matter.  The indictment in this case alleged the false pretense to be that the accused represented falsely that he had "a large amount of money on deposit in the Dallas National Bank."  The proof was that he represented that he "had $5,000 on deposit" in the said bank.  *Held,* that the indictment alleges the false pretense by substance, and there was no variance between the allegation and the proof.  See the opinion *in extenso* on the question.
2. SAME — CASE DISTINGUISHED.— It is insisted by the defense that, as the indictment alleges the sum of money fraudulently obtained by means of the false pretense to have been $106, while the proof shows that the amount so obtained was $109, a fatal variance between allegation and proof is manifest.  But *held,* that the variance is immaterial, it being sufficient for the State to show that the amount obtained was in excess of $20.  See the opinion for the distinction between this and Marwilsky's case, 9 Texas Ct. App., 377.
3. SAME — CHARGE OF THE COURT.— A special instruction, however correct, is properly refused if its substance has been embraced in the general charge..
4. SWINDLING — PRESUMPTION OF INNOCENCE — FACT CASE. — See the opinion *in extenso,* and the statement of the case, for evidence *held* insufficient to support a conviction for swindling, inasmuch as it is inadequate to overcome the presumption of innocence, and establish the guilt of the accused beyond a reasonable doubt.

APPEAL from the District Court of Grayson.    Tried below before the Hon. R. Maltbie.

The conviction in this case was for swindling J. W. Tong, and the punishment assessed by the jury was a term of seven years in the penitentiary.  The indictment charged that the appellant, in Grayson county, Texas, on the 18th day of May, 1885, executed and delivered to J. W. Tong a check on the Dallas National Bank, for the sum of $123.60, payable to the said J. W. Tong, and received from the said Tong thereon the sum of $106, by falsely representing to the said Tong that he had a large sum of money, sufficient to pay the said check, on deposit with the said bank, and that the said bank would pay any draft drawn against it by the said appellant.

The substance of the testimony of J. W. Tong, the first witness for the State, was that he lived at the town of Bells in Grayson

county, and was one of the proprietors of the drug store of Hagan
& Tong, situated in that town. He had known the defendant since
about the 1st of April, 1885, when the defendant arrived in Bells
and announced his intention of establishing a large drug house, and
engaging in the practice of medicine. He established his head-
quarters at the drug store of the witness, began the practice of
medicine, and soon had an apparently extensive practice, his pre-
scriptions being filled at the witness's drug store. On the Sunday
prior to the 18th day of May, 1885, the defendant told the witness
that he had a large amount of money with the Dallas National
Bank, which was situated in Dallas, Texas. On the 18th day of
May, 1885, the defendant applied to the witness for a loan of money.
He told witness that he was going to San Antonio on business for
a few days; that he was going to take his wife with him, and that
witness's partner, Hagan, was going to help him bring back a lot of
stock and buggies. He told the witness, as an inducement to the loan,
that he had $5,000 deposited in the Dallas National Bank subject to
his draft, and that the bank would pay any draft or check drawn on
it by him. Believing the representations of the defendant, and ac-
cepting his draft as a valid demand against the Dallas National
Bank, the witness canceled defendant's indebtedness to the drug
store and paid him $109, current money of the United States, upon
a check or draft which he drew, signed and delivered to witness, as
follows:

"No. 6.                              Bells, Texas, May 18, 1885.
"*The Dallas National Bank:*
"Pay to J. W. Tong, Esq., or order, one hundred and twenty-
three 60-100 dollars.
"$123.60.                              Geo. H. Moore, M. D."

The defendant left Bells on the next morning, and the witness
heard no more of him until he was arrested in Texarkana in June,
1885. Witness sent the draft to Dallas for collection, but it was re-
turned protested, and witness had never recovered a cent of the
money he advanced to the defendant. Two or three days before
the money transaction defendant read to the witness a letter which
he claimed to have received from the cashier of the Dallas National
Bank. That letter had some weight with the witness, but the in-
ducement upon which witness parted with his money was the repre-
sentation of the defendant that he had a deposit of $5,000 in the
bank, and that his draft was a valid demand against it. Defendant
had a woman with him at Bells whom he represented to be his wife.
Witness had never seen or heard of the woman since she left with

the defendant on the 19th day of May, 1885.    Defendant had access to witness's drug department, but witness had never noticed him eating morphine.

E. M. Reardon, cashier and manager of the Dallas National Bank, was the next witness for the State.    Witness first met the defendant in Dallas in the spring of 1885, before he went to Bells.    He told witness that he expected shortly to receive from his brother, living near Natchez, Mississippi, quite a large sum of money as his part of his mother's estate, and that he wanted to make arrangements to deposit the money in the witness's bank.    Witness replied that he would accept the deposit.    He told witness that the money would be forwarded by express.    Defendant never deposited any sum of money in witness's bank, and had no money on deposit with that bank on May 19, 1885, or at any other time, to the witness's knowledge.    The books of the bank showed no deposit of money by defendant.    If any of the other employees of the bank ever received a dollar from the defendant on deposit, the witness did not know it, and the books did not show it.    Two checks were drawn against the bank by the defendant prior to May 18th, one for $11 and one for $25, both of which checks were cashed by witness, although defendant did not have a dollar with the bank, either on his own deposit or subject to his order.    Defendant was at the witness's bank on May 20, 1885, and drew a check for $40 on the bank, which the witness cashed.

Cross-examined, the witness stated that besides himself as cashier and manager, the Dallas National Bank had a president, who was a non-resident, a vice-president, one teller, two book-keepers and a corresponding clerk.    The teller and two book-keepers were authorized to, and frequently did receive money from the hands of depositors, and the corresponding clerk received all moneys sent to the bank by mail or express by depositors from abroad.    In a deposit book, which was kept by one of the book-keepers, an entry was made, or at least supposed to be made, of all moneys deposited with the bank.    The witness had never received a deposit from or for the defendant; the books showed no such deposit, and if either the teller, book-keepers or corresponding clerk ever received such a deposit witness did not know it.

The State next introduced in evidence a letter dated Bells, Grayson county, Texas, May 10, 1885, addressed to " Mr. Reardon, Cashier, Dallas National Bank, Dallas, Texas," and signed " Geo. H. Moore, M. D.," the substance of which was that the witness's brother, according to a letter received the day before by the writer,

would go to Natchez, and forward by express the money which was the subject of their previous understanding. The letter instructed Mr. Reardon that the whole amount to be expressed was $5,380, of which $4,500 was to be received on deposit for six months at five per cent., and the residue, $880, on open deposit subject to call. The letter went on to say that, notwithstanding the warnings of parties whose names the writer, on meeting Mr. Reardon, would divulge, as to the probable embarrassment of the Dallas National Bank, consequent upon reckless transactions with stock men, the writer had satisfied himself of the solvency and integrity of the bank, and of the interested motive of the bank's detractors, and would do business with the bank, and use his influence to get others to do the same. The letter concludes with an allusion to the two drafts, one for $25 and the other for $11, mentioned by the witness Reardon.

Reardon's letter to defendant in reply, which was read by the State in evidence, is as follows:

"Dallas National Bank,

"Dallas, Texas, May 12, 1885.

"Geo. H. Moore, M. D., Bells, Texas:

"*Dear Sir* — Your esteemed favor of 10th inst. received to-day. We will pay the checks mentioned when presented and charge the same to your account. We will receive your account as heretofore agreed, viz.: funds left for six months at the rate of five per cent. premium. We will also be glad to receive your open account, and will endeavor to treat you right. We appreciate your friendship, and will be pleased to see any of your neighbors and friends. The person who told you this bank was managed in a reckless manner lied, and gave you the falsehood for personal gain, as you say; and furthermore, it is my opinion that a man, or any set of men, who would do such a thing are not to be trusted themselves. They are rascals, and in due time will develop. I will be glad to convince you of our solidity at any time. The first time you are down, come and see me. I will consider anything you tell me confidentially.          Very sincerely yours,

"E. M. Reardon, Cashier."

The State next introduced in evidence the two checks referred to in defendant's letter, as follows:

"No. 3.                          Bells, Texas, May 6, 1885.

" *The Dallas National Bank:*

"Pay to the Tr. of Knights of Honor, or order, twenty-five dollars.

"$25.25.                          Geo. H. Moore, M. D."

"No. 4.                              BELLS, TEXAS, May 9, 1885.
" *The Dallas National Bank:*
"Pay to Langford & Berry, or order, eleven 70–100 dollars.
"$11.70.                              GEO. H. MOORE, M. D."

The State next introduced the check upon which this prosecution is based, and closed.

Doctor Puckett, the first witness for the defense, testified that the defendant practiced medicine at Bells, where witness resided, for six or eight months, and did a good business. Witness was present at the time the defendant drew and delivered the check to Tong. Witness had seen the Reardon letter to defendant prior to the drawing of the check, and heard the defendant read it while walking the floor. Tong was then present. Witness had been practicing medicine for thirty years. He was called to see the defendant about two weeks before the latter left Bells. Defendant was then at the hotel, sick. He had been using morphine to great excess, and was delirious. His then condition was the result of excessive use of morphine. He told witness that he had been taking fifteen and eighteen, and even as much as twenty, grains of morphine per day, and witness, on one day, gave him as much as twelve grains. An ordinary dose of morphine ranges from one-eighth of a grain to a grain. Three or four grains of morphine will kill any man unused to taking it. Under the influence of morphine, the defendant was a remarkably brilliant man, but in his normal condition of mind was quite dull, stupid and melancholy. Morphine used to excess will produce insanity, illusions and hallucination, and will render a man artificial. Defendant also suffered from *fistulo in ano.*

On cross-examination the witness declared again that the condition in which he found the defendant at the time of his professional visit to him was produced by the excessive use of morphine. An insurance policy was here exhibited to the witness, who admitted that he signed the application for the same as medical examiner. The examination was made by witness a day or two before defendant left Bells, at which time the defendant was a mental and physical wreck.

Doctor J. T. Freeman testified, for the defense, that he was the county physician, and as such was called to see the defendant in jail on the day after he was confined therein. He found defendant very restless and nervous, and commenced administering morphine in the quantity of two grains per day, but as defendant continued to fail the witness increased the allowance of morphine to four grains per day; which had been maintained ever since. Defendant

had taken ten grains on the present day of this trial, up to the moment of this testimony. When put in jail the defendant was a total mental and physical wreck, the result of excessive use of morphine. He has been losing flesh ever since the first day of his confinement, the result of confinement, the deprivation of morphine, and his rejection of food. Witness was not familiar with the effects of morphine upon the system, but knows that, having acquired the morphine habit, the person afflicted will lie, steal, or resort to any crime almost to secure the drug. Defendant told witness that he had been a morphine eater for four or five years, and had been taking as much as fifteen grains, and even more, per day.

Doctors Wilson, Sadler and Stever, all graduate physicians, testified that the usual dose of morphine ranged from one-eighth of a grain to a grain, and that three or four grains taken by one unaccustomed to its use would produce death. The excessive use of morphine will produce hallucination and illusion. It will cause the subject to see and believe things that have no real existence. It will destroy every vestige of self-respect, and will reduce the patient to the level of. a schemer, liar and thief to secure his supply of the drug. Doctor Stever testified that the morphine habit would not only, when the drug influence predominated, corrupt the subject in the manner of supplying his appetite, but will corrupt him in every way.

J. F. Pierce testified, for the defense, that he sold drugs in Bells in the spring of 1885, and during the period of the defendant's residence in that town sold him three bottles of morphine. He did not know whether the defendant took the morphine himself, or used it in practice.

The State, in rebuttal, introduced the questions propounded to Doctor Puckett as medical examiner by the Mutual Self Endowment and Benevolent Association of America, on the defendant's application for a life insurance policy. Among the several questions asked, Doctor Puckett answered, in writing, that:

"The applicant's (defendant's) figure is robust; his general appearance healthy; his health good; there is nothing about the applicant indicating that he has any disease organic or functional of the brain or any other portion of the nervous system, or any predisposition thereto; the functions of his abdominal and urinary organs are in a healthy condition. The applicant is, in my (Puckett's) opinion, a first-class risk, and I recommend the approval of his application.

(Signed)                    "G. Y. M. Puckett, M. D.," etc.

The motion for new trial raised the questions discussed in the opinion.

No brief for the appellant has reached the Reporters.

*J. H. Burts*, Assistant Attorney-General, for the State.

WILLSON, JUDGE.   In the indictment it is alleged that the defendant obtained the money from Tong by means of false and fraudulent representations, as follows, to wit: " that he, the said Moore, was possessed of certain large sums of money then deposited in the Dallas National Bank, in Dallas, Texas, and that said Dallas National Bank would honor and pay any checks or drafts made by him, the said Moore, upon and on said bank;  .  .  .  that the said Moore had then deposited in the said bank and subject to said check, a large amount of money sufficient for the payment of the same."   It is alleged that at the time of making said representations the defendant presented a check drawn by him upon said bank for $123.60, and by means of said check and said representations obtained from Tong the sum of $106.

As to the representations made by defendant to Tong, it is insisted by his counsel that there is a fatal variance between those alleged as above, and those proved by the evidence.   Tong testifies that the defendant represented to him that " he had $5,000 deposited in the Dallas National Bank, of Dallas, Texas, subject to the order of defendant, and that the Dallas National Bank would honor and pay any draft or check drawn by defendant on said bank;  .  .  . that he had money in said bank sufficient to pay off said check."   By comparing the representations, as alleged, with those proved, it will be seen that the only difference between them is that, as alleged, the defendant said he had certain large sums of money deposited in said bank, while, as proved, he said he had $5,000 on deposit there. Does this constitute a variance between allegation and proof, such as will set aside the conviction?

In indictments for this offense, the matter alleged to be false must be fully set out and described.   (*State* v. *Baggerly*, 21 Texas, 758; *Warrington* v. *The State*, 1 Texas Ct. App., 168; *Mathena* v. *The State*, 16 Texas Ct. App., 473.)   And the matter thus alleged is material; it is descriptive of the offense, and must be proved as alleged.   Mr. Bishop says: " Wherever there is a necessary allegation which cannot be rejected, yet the pleader makes it unnecessarily minute in the way of description, the proof must satisfy the description as well as

the main part, since the one is essential to the identity of the other." (1 Bish. Cr. Proc., § 485; *Warrington* v. *The State, supra; Davis* v. *The State*, 13 Texas Ct. App., 215.) But is it essential to prove precisely, word for word, the representations as alleged? Is it not sufficient to prove them substantially?

There are two ways of setting out words, whether written or oral; the one by their substance, the other by their tenor. If the indictment professes to set them out by their tenor the proof must conform thereto with almost the minutest precision. (*Baker* v. *The State*, 14 Texas Ct. App., 332.) But where the indictment, as in this instance, professes merely to give the substance of the representations made by the defendant, we understand the rule to be that it is sufficient to prove the substance of them. It is not necessary in such case to prove them with minute exactness, but only with that degree of certainty which will serve satisfactorily to identify the representations proved with those alleged. If this be done, there is in law no variance. Thus, in a prosecution for oral slander, it is essential to allege in the indictment the slanderous words, but it is not required to prove the precise words alleged. It is held sufficient to prove them substantially. (*Conlee* v. *The State*, 14 Texas Ct. App., 222.) The same rule obtains in perjury. (2 Bish. Cr. Proc., § 915.) And in a prosecution at common law for cheat and false pretense, it was in general sufficient to allege and prove substantially the false pretense, the tenor thereof not being required. (2 Bish. Cr. Proc., § 178.)

In the case we are considering we are of the opinion that the representations proved are substantially the same as those alleged. The defendant is alleged to have represented that he had certain large sums of money on deposit in the bank. It was proved that he represented that he had $5,000 on deposit in said bank. Five thousand dollars is regarded as a large sum of money, and so in substance the alleged and the proven representations are the same.

Again it is insisted that there is a fatal variance between the allegation of the amount of the money alleged to have been obtained by the defendant, and the proof in regard thereto. The indictment alleges the amount to have been $106, while the evidence shows that he obtained $109. We do not regard this as a fatal variance. It was not essential to prove the amount obtained precisely as alleged. It was sufficient to prove that the amount exceeded $20 in value. This case is unlike the case of *Marwilsky* v. *The State*, 9 Texas Ct. App., 377, cited by counsel for appellant. In that case the variance had reference to the allegation and proof

of the false pretense and not to the amount of money obtained by such false pretense. Mr. Bishop says: "Subject to exceptions resting on the form which the allegation either needlessly or necessarily assumes, the doctrine seems to be almost universal that, to avoid a variance, the substance only of the issue need be proved, thus: Where the punishment is by law greater or less according as the value of a thing is above or below a particular sum, the indictment must show to which class the case belongs; and the common method is to charge its value to be so many dollars. But, in proof, the exact sum thus set down need not appear; any value calling for the same punishment as that in the indictment being adequate. (1 Bish. Cr. Law, § 488*b*.)

Several objections are urged to the charge of the court, all of which we have duly considered, and, without taking time to discuss the objections in detail, we deem it sufficient to say that in our opinion none of said objections are well grounded. We regard the charge as a correct exposition of the law of the case, and in no wise unfair or illiberal to the defendant. As to the special charges requested by the defendant and refused, we think they were sufficiently embraced in the main charge given to the jury.

In one particular, we are of the opinion that the conviction is not supported by the evidence. It was proved that there were attending to the business of the Dallas National Bank a cashier, two bookkeepers, a teller and a corresponding clerk. Reardon, the cashier, was a witness in behalf of the State on the trial. He testified that these persons were each authorized to and frequently did receive money from the hands of depositors, and that the corresponding clerk received all money sent by mail or express to the bank from depositors abroad; that the bank kept a deposit book which was kept by one of the book-keepers, and on this book all deposits of customers were entered, or supposed to be entered, in the regular business of the bank. He stated that defendant had never deposited any money in the bank within his knowledge; that the books of the bank showed no deposit by defendant. He could not state whether or not the other employees in the bank had received any money from defendant on deposit. None of the other employees testified in the case.

Now, if the defendant had in fact money on deposit in said bank sufficient to pay the check drawn in favor of Tong, he is not guilty of the offense of swindling. It matters not that the deposit was not entered upon the books of the bank. The law presumes, in favor of the innocence of the defendant, that he stated the truth when he

represented to Tong that he had money on deposit in said bank sufficient to pay said check. This presumption of innocence is not overthrown by evidence on the part of the State establishing *prima facie*, merely, that he had no such deposit. This is not that character of case in which *prima facie* evidence of guilt shifts the burden of proof to the defendant. The presumption of innocence must be overcome by evidence which establishes guilt beyond a reasonable doubt. A case in point upon this subject is *Strong* v. *The State*, 18 Texas Ct. App., 19, where the rule is fully discussed and clearly declared. It was incumbent upon the State in this cause to prove in some manner, either by the testimony of the other employees of the bank, or by circumstances, the falsity of defendant's representations, beyond a reasonable doubt. Such proof was not adduced on the trial; and, because of a failure to adduce it, the judgment cannot stand, and is therefore reversed and the cause is remanded.

*Reversed and remanded.*

[Opinion delivered February 3, 1886.]